SWAN VIEW COALITION, INC., a non-profit corporation; Resources Limited, Inc., a nonprofit corporation; Friends of the Wild Swan, a nonprofit corporation; Five Valleys Audubon Society, a non-profit corporation; and Sierra Club, a nonprofit corporation, Plaintiffs,

v.

John F. TURNER, in his official capacity as Director of the U.S. Fish & Wildlife Service; Galen Buterbaugh, in his official capacity as Regional Director of the U.S. Fish & Wildlife Service, Region Six; Kemper M. McMaster, Acting Supervisor, Montana State Office, U.S. Fish & Wildlife Service; F. Dale Robertson in his official capacity as Chief of the U.S. Forest Service, Department of Agriculture; John Mumma, in his official capacity as Regional Forester, Region One, of the U.S. Forest Service, and Joel Holtrop, in his official capacity as Forest Supervisor, Flathead National Forest, Defendants.

No. CV 89–121–H–CCL.

United States District Court,
D. Montana,
Helena Division.

Dec. 7, 1992.

Douglas L. Honnold, Fern L. Shepard, Andrew Caputo, Sierra Club Legal Defense Fund, Denver, CO, John Heberling, McGarvey, Heberling, Sullivan & McGarvey, Kalispell, MT, Daniel J. Rohlf, Portland, OR, James Goetz, Bozeman, MT, for plaintiffs.

Bernard F. Hubley, Asst. U.S. Atty., Helena, MT, John O. Mudd, Garlington, Lohn & Robinson, Missoula, MT, Steven P. Quarles, Thomas R. Lundquist, Crowell & Moring, Washington, DC, for defendants.

## OPINION AND ORDER

LOVELL, District Judge.

This action is before the court on various motions by the parties including cross motions for summary judgment on the first cause of action, and Defendant–Intervenor Intermountain Forest Industry Association's motion for summary judgment on Plaintiffs' second cause of action. This matter came on for hearing before the court, and the motions for summary judgment were deemed submitted at that time. Additionally, Plaintiffs have moved the court to amend the complaint and to supplement the administrative record. The court will address these latter motions at the outset.

Concerning Plaintiffs' motion to amend their complaint, Federal Defendants do not object to the motion and do not request an opportunity to further brief any issues on the basis of the amended complaint. Intermountain Forest Industry Association ("IFIA") does object to the motion on the grounds that Plaintiffs unreasonably delayed in moving the court to amend. Additionally, if the motion to amend is granted, IFIA requests the court to award it costs in the amount of $1,500.00 to cover its expenses in briefing certain issues concerning standing which would be rendered moot by the amended complaint.

The court does not find that Plaintiffs unreasonably delayed in requesting leave to amend their complaint in this case. Significantly, even if the court had found unreasonable delay the law in the Ninth Circuit is clear that "delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987). Therefore, Plaintiffs' motion to amend their complaint is granted and no costs are awarded to IFIA.

Plaintiffs have also moved the court to supplement the administrative record. Plaintiffs request that information be re-viewed by the court concerning consultation practices between the Fish and Wildlife Service and the Forest Service at later stages of forest development. Though the court fully comprehends and appreciates Plaintiffs' interest in this regard, it does not find sufficient justification to expand the record on this issue. Therefore, Plaintiffs' motion to supplement the administrative record is denied.

Finally, Defendants contend that the court should not consider the additional affidavits submitted by Plaintiffs at the time of the hearing in this matter. Notwithstanding Defendants' objections, the court will consider the affidavits to the extent they are relevant.

## BACKGROUND

### Nature of Suit

Plaintiffs Swan View Coalition, Resources Limited, Friends of the Wild Swan, Five Valleys Audubon Society, and Sierra Club ("Plaintiffs") have raised two claims in this action. In their first, Plaintiffs allege that the United States Fish and Wildlife Service ("FWS") breached its duties under the Endangered Species Act ("ESA") by failing to prepare an adequate, comprehensive biological opinion concerning the impacts on endangered and threatened species of the United States Forest Service's adoption of the Flathead Forest Plan.

The second claim alleges a taking of the threatened grizzly bear and the endangered gray wolf as a result of the United States Forest Service's ("Forest Service") operation and maintenance of excessive open-road densities on the Flathead National Forest.

Plaintiffs ask the court to set aside the FWS biological opinion and direct FWS to prepare a revised biological opinion in compliance with the Endangered Species Act. Additionally, Plaintiffs ask the court to declare unlawful and enjoin any further road construction in grizzly bear and gray wolf habitat on the Flathead National Forest until the Forest Service has fully complied with the requirements of the ESA. Plaintiffs also ask that the court declare unlawful and enjoin any roadbuilding in bear and wolf habi-

tat where the open road density exceeds one mile of road per one square mile of National Forest land.

Federal Defendants move for summary judgment on Plaintiffs' first claim on the grounds that Plaintiffs lack standing to sue and because FWS fully complied with the ESA in developing its biological opinion concerning the Flathead Forest Plan. IFIA moves for summary judgment on both claims.

### Flathead National Forest

The Flathead National Forest is located in northwestern Montana, and has well over 2 million acres of land within its boundaries. Congress has designated over 1 million acres of the Flathead National Forest as part of the National Wilderness Preservation system. Additionally, other portions of the Forest are designated Wild and Scenic River areas, hiking areas and an Experimental Forest area.

Among the animals in the Flathead Forest are the grizzly bear, a "threatened" species, and the gray wolf, which was listed as an "endangered" species in 1973. The Flathead Forest is part of the Northern Continental Divide Grizzly Bear Ecosystem, and it is estimated that this ecosystem sustains a population of between 400 and 700 grizzly bears. Current population estimates concerning the gray wolf are varied, but a number of wolf packs have been tracked in the Northern Rocky Mountain area, including in the Flathead Forest.

Bald eagles and peregrine falcons are also found within the Flathead National Forest. Both species are listed as "endangered" under the Endangered Species Act. At least ten active bald eagle nesting pairs live within the Flathead Forest. No peregrine falcon nests are known to exist within the Flathead Forest, though peregrine falcons have been observed in the Flathead during migration flights in the spring and fall.

### Forest Planning

Under the National Forest Management Act, 16 U.S.C. §§ 1601–1612 ("NFMA"), the Forest Service is directed to prepare land and resource management plans for individual units of the national forest system which serve as guides to the agency's management for ten to fifteen years. 16 U.S.C. § 1604(f)(5). The NFMA expressly delegates to the Secretary of Agriculture the responsibility to issue regulations to guide the content, development and form of forest plans. 16 U.S.C. § 1604(g)(1)–(3). Under those regulations, a forest plan is to "provide for multiple use and sustained yield of goods and services from the national forest . . . in a way that maximizes long term net public benefits in an environmentally sound manner." 36 CFR 219.1(a). Every resource plan, permit, contract, or any other document pertaining to the use of the forest must be consistent with the Forest Plan. 16 U.S.C. § 1604(i).

### Section 7 Consultation on the Flathead Forest Plan

Pursuant to the NFMA, the Forest Service conducted forest planning for the Flathead National Forest throughout the 1980's. On March 2, 1983, the Flathead Forest initiated formal ESA consultation with FWS concerning the Flathead Plan. On May 15, 1985, the FWS issued a biological opinion which concluded that "implementation of the proposed Flathead Forest Plan is not likely to jeopardize the continued existence of the grizzly bear, gray wolf, bald eagle or peregrine falcon." (R:II; 35, p. 1).

The Flathead Plan was published in December of 1985, and a January 17, 1986, letter from FWS stated the agency's finding that the "changes do not alter the conclusion of our May 15, 1985 no jeopardy opinion." (R:II; 40). The Flathead Forest Plan was subsequently approved by the Regional Forester on January 22, 1986.[*]

In December of 1988, the Forest Service proposed amendments to the Forest Plan,

---

[*] The court's previous opinion in *Swan View Coalition, et al. v. Dale Robertson, et al.,* 789 F.Supp. 1529 addressed the adequacy of the Flathead Forest Plan and the Environmental Impact Statement prepared on the Plan. In that case, the court concluded that the Forest Service considered the factors relevant to making an informed and reasoned decision in selecting Alternative No. 17 as the alternative to manage the Flathead National Forest.

and entered into further § 7 consultation with FWS concerning those amendments. FWS issued a formal biological opinion on February 22, 1989, which concluded that "implementation of the proposed amendments, numbers 3 through 14, to the ... Plan is not likely to jeopardize the continued existence of the grizzly bear, gray wolf, or peregrine falcon." (R:II; 47, p. 1) In this opinion, FWS stated that "[d]ue to the general nature of forest plans, ..., formal consultation will be required on specific project activities that the Forest determines may affect threatened/endangered species." (R:II; 47, p. 2).

On July 18, 1989, FWS issued an "amendment to the Service's 1985 and 1989 biological opinions [which] covers the Flathead National Forest plan, as amended." (R:II; 61). This amendment to the biological opinion described the action taken by the Forest Service as programmatic in nature, providing management goals, standards and guidelines under which project level activities may be planned and implemented. (R:II; 61, p. 2). The amendment also described the current status of the grizzly bear, the gray wolf, the bald eagle and the peregrine falcon. (R:II; 61, pp. 4-6); analyzed the direct and cumulative effects of the action on these species (R:II; 61, pp. 7-28); and provided an incidental take statement (R:II; 61, pp. 30-31).

The July, 1989, amendment further stated that the Flathead Plan as amended is not likely to jeopardize the grizzly bear or gray wolf species. (R:II; 61, p. 2).

## DISCUSSION

### CLAIM I: INADEQUATE BIOLOGICAL OPINION IN VIOLATION OF ESA § 7.

### STANDING:

In their first cause of action, Plaintiffs challenge the adequacy of FWS's biological opinion concerning the Flathead Forest Plan. Section 7 of the ESA requires FWS to consult with the Forest Service concerning the impacts on threatened and endangered species of the Flathead Forest Plan and whether the Forest Plan is likely to jeopardize the continued existence of these species. The end result of this consultation process is the biological opinion authored by FWS. Plain-

tiffs' first claim alleges that FWS too narrowly construed the scope of the "agency action" (the approval of the Flathead Forest Plan) when preparing its biological opinions and that FWS, therefore, failed to prepare a legally adequate biological opinion. Defendants argue that Plaintiffs lack standing to bring this claim.

In order to establish standing, Plaintiffs must show that "[1] they or their members have personally suffered an actual or threatened injury due to the defendant's allegedly illegal conduct, [2] that the injury can be fairly traced to the challenged conduct, and [3] that the injury is likely to be redressed by a favorable decision." *Friends of the Earth v. United States Navy,* 841 F.2d 927, 931 (9th Cir.1988) (citations omitted).

■ Beyond this three-part Article III test, courts have also imposed prudential limitations on a litigant's standing to bring a claim. Under these prudential limitations, courts have required that a plaintiff assert its own legal rights and interests rather than those of third parties, and also that it not allege generalized or abstract grievances more appropriately addressed by the legislature. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Furthermore, a complaint must fall within the "zone of interests" to be protected by the statute at issue. *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Prudential limitations, however, merely supplement Article III standing requirements and do not constitute limitations on judicial power to determine constitutionally justiciable actions. *Preston v. Heckler,* 734 F.2d 1359, 1365 (9th Cir.1984).

■ As opposed to the Article III requirements for standing, Congress may eliminate the prudential limitations by legislation. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Where "Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination

of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In this case, Plaintiffs' first claim is brought under the "citizen-suit" provision of the ESA which provides that "any person may commence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter." 16 U.S.C. § 1540(g). Under 16 U.S.C. § 1532(13), environmental organizations qualify as "persons" and may bring suits in their own name. Therefore, Plaintiffs in this action need only meet the constitutional requirements for standing in order to bring their claim under the ESA.

### Injury in Fact

■ To satisfy the first prong of the Article III test, the personal injury requirement, the alleged harm must be "distinct and palpable ... and not abstract or conjectural or hypothetical." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

In this case, Plaintiffs have articulated three separate interests—procedural, substantive, and informational—which they claim have been injured by FWS's alleged failure to comply with ESA procedures.

■ Plaintiffs first assert a procedural injury arising from FWS's alleged noncompliance with ESA procedures which they contend resulted in a legally insufficient biological opinion. Under this procedural injury theory, Plaintiffs contend that FWS's failure to comply with the procedural requisites of the ESA constitutes an injury in and of itself which is sufficient injury in fact to support standing under the constitutional standing tests.

Plaintiffs are correct in asserting that the Ninth Circuit Court of Appeals "has long recognized that failure to follow procedures designed to ensure that environmental consequences of a project are adequately evaluated is sufficient injury in fact to support standing." *Friends of the Earth*, 841 F.2d at 931. (citing *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975)). In this case, Plaintiffs have alleged that FWS's failure to issue an adequate biological opinion on the Flathead National Forest Plan threatens harm to threatened and endangered species found within the Flathead National Forest because possible impacts resulting from the Plan have not been sufficiently considered.

However, even under "procedural injury" theory, the citizen suit provision of the ESA does not create "an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2143, 119 L.Ed.2d 351, 372 (1992) —— U.S. at ——, 112 S.Ct. at 2143, 119 L.Ed.2d at 372. Though the Court in *Lujan* acknowledged that "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing," it also held that "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." —— U.S. at ——, 112 S.Ct. at 2137, 119 L.Ed.2d at 365 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636, 643 (1972)).

This requirement that members personally incur a particular injury is in line with the Ninth Circuit's injury in fact standard as stated in *City of Davis*:

> The procedural injury ... is itself a sufficient "injury in fact" to support standing, provided this injury is alleged by a plaintiff with a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.

521 F.2d at 671.

■ It is evident from the holdings of these cases that a "procedural injury" does not exist in a vacuum and that standing is not established by its mere assertion. It is fundamental that a plaintiff's mere interest in having "the government act in accordance with the law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984). To estab-

lish standing, a plaintiff must "be himself among the injured." This personal injury requirement can be satisfied by showing a "sufficient geographical nexus to the site of the challenged project." *City of Davis,* 521 F.2d at 671.

In this case, Plaintiffs have submitted affidavits which set out in specific detail the recreational, aesthetic and other uses of the affected areas of the Flathead National Forest which are regularly enjoyed by Plaintiffs' members. These uses include the observation of the listed species which inhabit the Forest. *See* Conner Declaration, pp. 3–16; March 1991 Hammer Affidavit, pp. 2–6, 8.

These affidavits are equally applicable in supporting Plaintiffs claim that they will suffer a substantive injury because of FWS's failure to provide an adequate biological opinion. This claim alleges that FWS's failure to provide an adequate biological opinion at the forest plan stage will inexorably result in substantive jeopardy to threatened or endangered species.

The substantive injury and the procedural injury asserted by Plaintiffs in this case are inherently connected as the substantive injury relates to the environmental consequences which will result from the alleged procedural failure. . Both injuries are "but two sides to a single coin: It is the alleged procedural failure … that 'creates a risk that environmental impact will be overlooked' (in the future)." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1514 (9th Cir.1992) (citation omitted).

The court finds that Plaintiffs, through their amended complaint and supporting affidavits, have sufficiently pleaded under both the procedural and substantive injury theories that their members have a concrete personal interest in the protection of threatened or endangered species in the Flathead National Forest and that their members would be directly and adversely affected by any failure to protect those species. However, the court must still determine whether Plaintiffs' asserted injuries are traceable to FWS's alleged violation of the ESA.

### *Fairly Traceable and Likely to be Redressed*

■ Standing is established if a plaintiff can show a causal connection between his asserted injury and the complained of conduct and that his injury is redressable through the remedy sought. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. The issues of traceability and redressability can be dealt with together because both are "alike in focusing on the question of causation." *City of Los Angeles v. NHTSA,* 912 F.2d 478, 483 (D.C.Cir.1990) (quoting *Haitian Refugee Center v. Gracey,* 809 F.2d 794, 801 (D.C.Cir. 1987) (opinion of Bork, J.)).

In this case, Defendants argue that even if Plaintiffs have a sufficient geographical nexus to the Flathead National Forest and even if threatened harm to listed species constitutes injury in fact to Plaintiffs' members, such harm is not fairly traceable to FWS's biological opinion. Defendants offer three basic reasons why Plaintiffs fail to satisfy the traceability requirement for standing. First, Defendants point out that FWS performs only a consulting or advisory role under ESA § 7(a)(2) and that any recommendations made in a biological opinion are not legally binding on the "action agency." 16 U.S.C. § 1536(a)(2). As the "action agency" in this case, the Forest Service is the ultimate decision maker and is fully responsible for ESA compliance. Therefore, Defendants argue that the biological opinions cannot directly lead to any injury because of the intervening nature and overriding power of the Forest Service's decisions concerning ESA compliance. Additionally, Defendants contend that the claimed injury can only result from a site-specific activity. Because neither the biological opinion nor the Forest Plan authorizes any site-specific activity, Defendants argue that the claimed injury cannot be traceable to the allegedly inadequate biological opinion. Furthermore, Defendants contend that the future ESA § 7 evaluations which are required at the project development stage and which must occur before any site-specific activities are authorized will act as preventive safeguards against substantive violations of the ESA.

In *Idaho Conservation League v. Mumma*, *supra*, the Ninth Circuit Court of Appeals addressed arguments very similar to those now raised by Defendants. In that far-reaching decision, the court held that an asserted harm can be threatened rather than actual and can be contingent rather than certain. *Idaho Conservation League*, 956 F.2d at 1515. The court also indicated that merely because "the potential injury would be the result of a chain of events need not doom the standing claim." *Id.* Continuing, the mere fact that "third parties would have to act before actual development could take place is not dispositive.... In numerous cases courts have ruled that a possible chain of third-party responses to agency action was sufficient to confer standing." *Id.* In this case, therefore, the fact that the Forest Service must further act before any subsequent development takes place does not defeat Plaintiffs' standing.

Additionally, though the court in *Idaho Conservation League* acknowledged that the alleged risks of harm were not only contingent upon the actions of third parties but subject to future safeguards as well, it nevertheless held:

> ... Notwithstanding the fact that their concrete effect might be seriously mitigated at the site-specific, project level, the initial plan and wilderness recommendation represent important decisions....

> Viewed in this light, and whether or not it is irrevocable, the Service's decision is harmful for standing purposes.... Indeed, short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the management plan plays some, if not a critical, part in subsequent decisions.

> More importantly perhaps, if the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at

some point, have standing to challenge. That point is now, or it is never.

*Id.* at 1516.

In this case, the procedures in question concern the formal consultation procedures, including the preparation of biological assessments and opinions, described in Sections 7(a) and (b) of the ESA and their implementing regulations. These procedures are not only required but also essential to the realization of the ESA's stated purposes. As the Ninth Circuit Court of Appeals has consistently noted, "[t]he substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection [of listed species]. Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature." *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir.1987). And, as was stated in *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985), "[i]f a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible." *Id.* at 764.

Unquestionably, the formal consultation procedures at issue in this case are designed to protect the Plaintiffs' concrete interest in the preservation of listed species in the Flathead National Forest. Therefore, a failure by FWS to comply with these procedural requirements and provide an adequate biological opinion at the forest plan stage could result in an impermissible violation of ESA's substantive requirements. To hold otherwise would be to assume "that Congress imposed useless procedural safeguards," and that because the Forest Plan authorizes no site-specific activities, the biological opinion concerning the Plan "is a superfluous step." *Idaho Conservation League*, 956 F.2d at 1516.

Furthermore, in *Idaho Conservation League* the court stated:

> [T]he fact that development might never take place or that redrafting an EIS might not in any way change the Secretary's recommendations to Congress is irrelevant. The asserted injury is that environ-

mental consequences might be overlooked and reasonable alternatives ignored as a result of deficiencies in the final EIS and ROD. The ultimate outcome following proper procedures is not in question.

*Id.* at 1518.

The same is true in this case. The mere fact that the Forest Service is not bound by the recommendations of FWS and that a redrafted biological opinion would not necessarily result in a modified Forest Plan is irrelevant. The asserted injury in this case is that "environmental consequences might be overlooked ... as a result of deficiencies" in the biological opinion. The fact that the Forest Service might not alter its course in any way following the completion of a new biological opinion does not negate this asserted injury.

Because the Forest Plan pre-determines future development within the Flathead National Forest and insofar as environmental consequences may be overlooked due to an inadequate biological opinion concerning that Plan, the Plaintiffs' have asserted concrete procedural and substantive injuries which are traceable to the FWS's alleged failure to fully comply with the procedural requirements of the ESA and which are redressable by the relief sought.

Based on the foregoing analysis, I conclude that Plaintiffs have established standing. The court further concludes that Plaintiffs have presented a controversy ripe for adjudication and does not reach the issue of informational injury.

**MERITS:**

In reviewing the FWS's biological opinion issued pursuant to the agency's duties under § 7 of the ESA, the court must determine whether the opinion was drafted in a way that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706; *see Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 981–982 (9th Cir.1985). Pursuant to this standard of review, the court should uphold the FWS decision if the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* at 982 (quoting

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). Where an agency action is challenged on the record as arbitrary and capricious, summary disposition is appropriate. *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479 (W.D.Wash. 1988).

### Endangered Species Act Consultation Procedures

The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* was enacted by Congress in 1973 for the purpose of conserving endangered and threatened species. Section 7 of the ESA imposes numerous substantive and procedural requirements on federal agencies, the paramount requirement being that each federal agency "shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." 16 U.S.C. § 1536(a)(2).

To assist agencies in complying with this provision, § 7 sets out a detailed consultation process designed to provide federal agencies with expert advice in determining the biological impacts of their proposed activities. 16 U.S.C. § 1536(b). Under this process, the Secretary of the Interior, acting through FWS, consults with federal agencies on agency actions likely to affect listed species. After formal consultation, FWS issues biological opinions which evaluate the likely impacts of the agency action on threatened and endangered species, and describe whether the action is likely to jeopardize listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A).

If FWS finds a potential violation, it is to suggest reasonable and prudent alternatives to the agency action which would not run afoul of § 7. *Id.* In meeting its obligations under this provision, FWS must base its biological opinions and recommended alternatives on the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

■ In this case, the parties are in agreement that the agency action consists of the decision to approve the Flathead Forest Plan. The parties also agree that in the

Flathead Plan the Forest Service: (1) established forest-wide standards and guidelines; (2) set resource production objectives; (3) zoned the forest into management areas, each with particular management prescriptions; and (4) determined which lands to include in the suitable timber base.

Defendants contend that due to the broad, programmatic nature of the Forest Plan which does not authorize any site-specific development and which envisions future ESA evaluation at the development stage, FWS fully complied with its duties under the ESA by focusing its review on the standards and guidelines adopted in the Plan which pertain to protection of listed species. Defendants further contend that further analysis of the type requested by Plaintiffs would have been speculative.

Plaintiffs assert that the biological opinion was inadequate because FWS construed the scope of the agency action too narrowly and failed to directly address or analyze the impact of many of the decisions made in the Plan. For example, Plaintiffs point out that FWS did not analyze the resource production objectives in the Plan which establish the ceiling for the amount of timber that can be sold on the Flathead National Forest. Under the plan, the ceiling is set at 100 million board-feet per year. Plaintiffs argue that these resource production objectives provided FWS with hard and fast numbers detailing the future development scheme proposed by the Forest Service.

Plaintiffs also point to the zoning decisions in the Plan which determine which areas of the forest will be subject to what types of development. Plaintiffs assert that these zoning decisions are crucial in terms of impacts on listed species, and contend that FWS failed to evaluate whether there are certain areas so important to listed species that they should be set aside for special management.

In addition to setting resource output objectives and zoning the forest, the Forest Service also determined the suitability of lands for inclusion within the timber base. This screening process not only determines the suitability of lands for timber production but also generally evaluates what type of harvesting methods would be best suited for certain types of forest.

Because FWS failed to analyze the resource production objectives, the zoning decisions, or the screening decisions included in the Flathead Plan, Plaintiffs contend that the biological opinion is inadequate. The court disagrees and finds that FWS properly focused on the standards and guidelines adopted in the Plan which directly relate to the protection of threatened and endangered species.

The standards adopted in the Plan concern factors necessary to the continued existence of listed species and are binding on the Forest Service. Additionally, the Interagency Grizzly Bear Guidelines ("IGBG") were adopted in their entirety in the Forest Plan. These guidelines identify factors which are important to the recovery of the grizzly bear. Because recovery represents a higher threshold of species management, the guidelines are not binding on the Forest Service but must be considered by that agency in its decision-making.

The court is impressed by the considerations and protections included in the Forest Plan through the adoption of the IGBG. For instance, timber sale activities will occur at a time when the area has the least biological importance to the bear. Forest Plan at II–31. When harvest units are located adjacent to natural manmade openings, hiding cover will be maintained on approximately 75 percent of the opening's perimeter. *Id.* Clearcutting stands should not occur until adjacent harvested units qualify as summer hiding cover, and the agency is to maintain a minimum of 40 percent cover of each project area with 20 percent in summer hiding cover and 20 percent in summer thermal cover distributed throughout the area. *Id.* Based on these kinds of protections and considerations, FWS issued its "no jeopardy" opinion on the Flathead Forest Plan. In the final amendment to the opinion, FWS stated that the "Forest Service, by authorizing the Forest Plan, committed to conducting its timber program, road management program, recreational program, etc. within the constraints of the grizzly bear standards and guidelines

and those developed for other listed species." (R:II; 61, p. 3). The biological opinion continued on to state that "if both the Forest Plan standards *and* guidelines are consistently adhered to, the Forest Plan *is not likely to adversely affect* the grizzly bear." (R:II; 61, p. 24). (Emphasis in original). Any "departure from the guidelines" would "requir[e] formal consultation." *Id.*

In maintaining that FWS failed to issue an adequate biological opinion because it limited its review to the standards and guidelines and consultation safeguards built into the Plan, Plaintiffs rely primarily on the decision in *Conner v. Burford*, 848 F.2d 1441 (9th Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). In that case, the Forest Service requested formal consultation with FWS concerning the proposed sale of oil and gas leases. FWS divided the oil and gas activities into stages and reviewed only the leasing stage because it determined there was insufficient information to prepare a biological opinion covering later stages. In lieu of a comprehensive biological opinion at that time, FWS proposed "ongoing consultation and preparation of additional biological opinions at various stages of post-leasing activities." *Conner*, at 1444. In deciding against FWS and the Forest Service, the court held that the agency action "entailed not only leasing but leasing and all post-leasing activities through production and abandonment." *Id.* at 1453. The court then ruled that the subsequent consultations planned by FWS did not relieve it of its duty to issue a comprehensive opinion concerning all stages of lease development and ordered FWS to make projections of future oil and gas activities to help anticipate "potential conflicts between development and the preservation of species." *Id.* at 1454.

Based on *Conner*, Plaintiffs contend that (1) FWS should have analyzed the potential effects on the Flathead National Forest resulting from the implementation of the Plan; (2) the future consultation mechanism built into the Plan does not relieve FWS of its burden of analysis at the planning stage; and (3) FWS should have made projections concerning impacts on threatened and endangered species based upon the resource production objectives and timber sale schedules included in the Plan. Each of these contentions is discussed hereafter.

First, there is a crucial difference between the situation in *Conner* and in this case. In *Conner*, FWS addressed the initial leasing stage without any consideration whatsoever to later development. Here, however, FWS's review of the Forest Plan included an analysis of the detailed standards and guidelines adopted by the Forest Service for the protection of threatened and endangered species which will regulate all subsequent development on the Flathead National Forest.

Plaintiffs also argue that FWS's "no jeopardy" opinion relied upon future consultations and that such reliance is contrary to the holding of *Conner*. Defendants argue that the programmatic nature of the Forest Plan requires a certain amount of reliance on future biological evaluations and § 7 consultation because no site-specific activities are authorized under the Plan and until such projects are actually proposed, their potential impacts cannot possibly be evaluated. The court finds substantial merit in this argument.

In *Conner*, the court discussed the Outer Continental Shelf Lands Act ("OSCLA"), and determined that its statutorily segmented approach to offshore oil projects allows for "graduated compliance with environmental and endangered life standards." *Conner*, 848 F.2d at 1456 (quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C.Cir. 1980)). This "graduated compliance" was considered effective under OSCLA because of a system of "checks and balances" built into the Act which specifically requires consultation at every stage. *Conner*, at 1456.

Defendants do not contend that the NFMA is statutorily segmented as is OSCLA. However, they do contend that the NFMA is a "multiple objective" statute with its own system of checks and balances in place which adequately safeguards endangered species. Therefore, Defendants argue that NFMA is analogous to OSCLA and that future consultations at subsequent stages of forest development should be deemed necessary and ef-

fective safeguards for ESA compliance. I agree.

This conclusion does not run counter to the holding of *Conner* for two reasons. First, whereas the sale of a lease as in *Conner* is no more than a simple transaction which grants certain rights to the lessees and directly leads to development, the Forest Plan is a broad framework for the management of a National Forest which does not directly commit to development. Allowing for additional review at each subsequent stage of development recognizes both the managerial purpose of a Forest Plan to provide mechanisms for monitoring and regulating future development as well as its inherent limitations in predicting what development will actually occur.

Second, FWS's review of the agency action in *Conner* gave no consideration to future development and relied entirely on future consultations. In this case, however, FWS has already given ample consideration to the standards and guidelines under which all future development will be undertaken. Therefore, any future consultation in this case would be in *addition* to the analysis already done at the Plan stage rather than the only review as was the case in *Conner*. In sum, the court finds that the broad programmatic nature of the Forest Plan necessitates the need for future consultations at later stages of development and relieves FWS of the burden of speculating on the potential impacts of site-specific activities. Additionally, the court finds that such limited reliance on future consultations is acceptable under the holding in *Conner* because the future consultations are in addition to the comprehensive review of the standards and guidelines at the Plan stage.

■ Finally, Plaintiffs argue that FWS should be compelled to analyze the resource production objectives so that the Forest Service can look at the "big picture" before adopting the Plan. As stated above, these resource production objectives simply represent a ceiling on timber production and do not mandate that such quantities actually be harvested. Nevertheless, Plaintiffs insist that the resource production objectives rep-resent available information that must be analyzed by FWS.

The court does not agree that either the ESA or the holding in *Conner* requires an analysis of the resource production objectives in this case. Section 7 of the ESA requires FWS to base its opinion on the best scientific and commercial data available to insure that protected species are not jeopardized. 16 U.S.C. § 1536(a)(2). Therefore, analysis of information is required only where such information represents the best scientific or commercial data available and only when such analysis is necessary to identify potential conflicts between development and the protection of threatened and endangered species.

In this case, the best data available consisted of the scientifically formulated standards and guidelines adopted in the Plan. These standards and guidelines were developed by an interagency team on the basis of their biological expertise concerning the essential needs of threatened and endangered species. FWS reviewed the standards and guidelines adopted in the Forest Plan and concluded that this framework would control site-specific projects and insure that listed species would not be jeopardized by future development under the Plan. This conclusion is valid because the standards and guidelines operate as parameters within which all future development must take place. If a development project cannot be maintained within those parameters, the safeguard mechanisms in the Plan will prevent such development from going forward. Because of this preventive framework, speculation concerning the potential impacts of harvesting one billion board-feet of timber over the next ten years is unnecessary. Though an analysis of the resource production objectives might be filled with sound and fury, in the end it would signify nothing. Even if FWS were to determine that future timber production equalling the levels proposed in the production objectives would jeopardize listed species, the safeguards already built into the plan guarantee that such jeopardy would be averted before such levels of production were ever reached. Therefore, an analysis of the nature requested by Plain-

tiffs would be no more than an academic exercise. Though it might result in the Forest Service modifying its production objectives, it would accomplish nothing in terms of species protection.

Plaintiffs launch one final attack on FWS's failure to analyze the resource production objectives by asserting that it would be in the best interests of the Forest Service and the timber industry to know at the planning stage whether the production goals set forth in the Plan were actually feasible under the constraints of the ESA. Plaintiffs argue that such analysis would enable the Forest Service to make accurate budget requests and provide resources to local communities with some assurance that the Plan's proposed level of timber output would actually occur. Similarly, Plaintiffs are concerned that the timber industry will make job and investment decisions based on programmed timber harvest levels that may never occur because the ESA mechanisms built into the Plan may require the halting of timber harvesting before the planned objectives are reached. Though these are legitimate concerns, they are irrelevant for determining FWS's duties pursuant to § 7 of the ESA. The ESA consultation procedures are designed to protect listed species and not to facilitate Forest Service budget requests.

Plaintiffs also argue that FWS should have made specific findings concerning the impacts of the zoning and screening decisions made in the Plan. However, as has been discussed at length, FWS appropriately reviewed the standards and guidelines in the Plan and concluded that they would insure that subsequent implementation of the Plan would not jeopardize listed species. This conclusion was based on the Plan as it existed, including the zoning and screening decisions. Therefore, further evaluation of those decisions would be pointless.

Based on the foregoing analysis, the court finds that by reviewing the detailed standards and guidelines adopted by the Forest Service, and by relying on its expertise to conclude that such safeguards will insure that protected species will not be jeopardized by the Flathead Forest Plan, the United States Fish and Wildlife Service has issued a comprehensive biological opinion in full compliance with its duties as set forth in § 7 of the ESA.

## CLAIM II: TAKINGS IN VIOLATION OF ESA § 9

In their second claim, Plaintiffs assert that the Forest Service has allowed current open road densities within the Flathead National Forest to exceed one mile of road per square mile and that such road densities significantly modify and degrade grizzly bear and gray wolf habitat. Plaintiffs further allege that such habitat modification constitutes a § 9 taking under the ESA because it kills or injures grizzly bears and gray wolves by significantly impairing their essential behavior patterns, including breeding, feeding, and sheltering.

IFIA moves for summary judgment on this claim but Federal Defendants join in the motion only to the extent that IFIA's motion is based on Plaintiffs' failure to offer a sufficient level of proof. Federal Defendants do not agree with IFIA's arguments concerning the applicability of Montana law to this claim.

### Standing

IFIA first contends that Plaintiffs lack standing to bring their § 9 takings claim. Defendants argue briefly that the mere assertion of an injury to listed species and an organizational interest in the injured species is insufficient to support standing. Though this is a correct statement of the law, Plaintiffs have established a concrete interest in the preservation of grizzly bears and gray wolves in the affected areas by filing affidavits which show that their members use and enjoy the areas allegedly affected by excessive road densities. Furthermore, Plaintiffs have demonstrated through their pleadings and affidavits that the claimed takings, if proven, are traceable to the Forest Service's management practices which have allowed the excessive road densities. Therefore, Plaintiffs have standing to bring this claim.

### Standard of Review

Defendants next contend that the appropriate standard of review in this case is the arbitrary and capricious standard whereas Plaintiffs contend that a de novo standard

is proper. Defendants base their argument on the FWS § 7 consultation on the Flathead Forest Plan and the "incidental take statement" included in the biological opinion.

First, Defendants point out that open road densities were addressed in the Plan and that FWS recommended that certain road density standards be adopted. They further contend that the "no jeopardy" opinion was partially based on the inclusion of these standards in the Plan. Therefore, Defendants argue that excessive road densities would be in violation of the standards adopted in the Plan and considered in the § 7 consultation process. Defendants cite ample case law supporting their contention that review of agency actions alleged to be in violation of § 7 of the ESA is to be conducted under the arbitrary and capricious standard. *See e.g. Village of False Pass v. Clark*, 733 F.2d 605, 609–611 (9th Cir.1984). However, Defendants' argument fails for two reasons. First, Defendants' contentions that FWS's "no jeopardy" decision was based on road density standards recommended by FWS is misleading because such standards were never actually adopted in the Forest Plan. More importantly, even if the Plan had actually included the recommended standards, the § 7 FWS consultation and "no jeopardy" opinion would still have no relevance to Plaintiffs' § 9 takings claim because Plaintiffs are not alleging an injury resulting from the Forest Plan. In this case, the injury that Plaintiffs assert is caused by continuing physical conditions that predate the Plan. Therefore, the injury is not traceable to the Plan, the recommended standards, or the consultation process.

In *Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir.1991), the court concluded that de novo review of a § 9 takings claim is appropriate where the § 9 claim "does not involve an examination of the consultation process between the USFS and the USFWS." *Id.* at 438, n. 13. That the court should apply de novo review in the instant case is further supported by two district court decisions, *Palila v. Hawaii Department of Land and Natural Resources*, 649 F.Supp. 1070 (D.Hawaii 1986), *aff'd*, 852 F.2d 1106 (9th Cir.1988) and *Palila v. Hawaii Department of Land*

*and Natural Resources*, 471 F.Supp. 985 (D.Hawaii 1979), *aff'd*, 639 F.2d 495 (9th Cir. 1981), in which the court reviewed the evidence de novo in considering § 9 claims unrelated to § 7 consultations. Therefore, this court will not apply the arbitrary and capricious standard of review based on the § 7 consultation process with FWS.

In a related argument, Defendants contend that the "incidental take statement" included in the biological opinion is controlling in this case. FWS addressed the issue of incidental takings of listed species which may occur as a result of the Flathead Plan and stated that the anticipated level of incidental take is zero. (R:II; 61, p. 31).

Section 7(b)(4) of the ESA provides that as part of the consultation process, FWS may issue an incidental take statement immunizing a federal agency from traditional takings liability if FWS identifies "the expected impact of the incidental takings, the reasonable and prudent measures necessary to minimize the impact, and the terms and conditions that the agency must comply with to implement those measures. 16 U.S.C. § 1536(b)(4)." *Defenders of Wildlife v. Admin., Environmental Protection Agency*, 882 F.2d 1294, 1300 (8th Cir.1989). The court finds that the incidental take statement issued in this case has no effect on the takings claim for two reasons. First, the incidental take statement in this case does not comport with the requirements of 16 U.S.C. § 1536(b)(4) by specifying the impact of incidental takings on listed species and "the reasonable and prudent measures necessary to minimize the impact." *Defenders*, 882 F.2d at 1300. Second, even if FWS had included a valid incidental take statement for the Flathead Forest Plan, it would not be applicable to Plaintiffs' claim because, again, the alleged injury does not arise from the Plan but from an existing physical condition that predates the Plan. Therefore, the incidental take statement relied upon by Defendants is both insufficient and inapplicable.

The court concludes that the incidental take statement exception does not immunize the Forest Service from Plaintiffs' takings claim in this case nor does it require the court to utilize the arbitrary and capricious

standard of review. Accordingly, the court finds that a de novo review of Plaintiffs' claim is proper.

### Flawed Claims and Insufficient Evidence

The Federal Defendants and IFIA both advance arguments in which they contend that Plaintiffs have not asserted a cognizable claim. Additionally, both IFIA and the Federal Defendants contend that even if the claim is cognizable, Plaintiffs have not submitted sufficient evidence to survive summary judgment.

First, IFIA contends that claims involving harm to listed species must demonstrate that "habitat modifications" would lead to the extinction of a listed species. However, this contention is not supported by the ESA or its implementing regulations.

The statutory meaning of "take" is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Under the regulations, "harm" is defined as "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. Though such habitat modification could lead to extinction, the regulation does not indicate that threatened extinction is necessary for a finding of harm. Therefore, Plaintiffs' claim is not invalid merely because it does not allege that extinction of a species will result from the excessive road densities on the Flathead National Forest.

Additionally, IFIA argues that Montana law is controlling in this case because Montana is a party to a "full-authority" cooperative agreement under § 6 of the ESA. Therefore, IFIA contends that Plaintiffs' takings claim must fail because, under Montana law, the definition of "take" does not include "harm" or "significant habitat modification" as under the ESA.

IFIA readily admits that the Montana provisions concerning takings of listed species are less restrictive than those under the ESA. Nevertheless, IFIA points to express language in the ESA which seems to contemplate less restrictive state law on takings. First, § 4(d) of the ESA provides that, in a cooperative agreement state, federal regulations prohibiting the taking of a *threatened* wildlife species "shall apply ... only to the extent that such regulations have also been adopted by such State." 16 U.S.C. § 1533(d). ESA § 6(g)(2) provides that, in a cooperative agreement state, the ESA taking prohibitions "shall not apply with respect to the taking of any resident endangered or threatened species ... except to the extent that the taking of any such species is contrary to the law of such State." 16 U.S.C. § 1535(g)(2). However, § 6(f) of the ESA provides, in relevant part:

> (f) Conflicts between Federal and State laws.
>
> ... Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f).

Though IFIA raises compelling arguments on this issue, based on the clear language of § 6(f) of the ESA combined with the overwhelming priority Congress has given to the preservation of threatened and endangered species, the court must conclude that the less restrictive takings provisions under Montana law are preempted by the ESA and that the definition of "take" under the ESA which includes "harm" and "significant habitat modification" is controlling in this case.

Federal Defendants contend that Plaintiffs' § 9 claim is not cognizable for yet another reason. They assert that Plaintiffs' allegations pertain only to the impaired recovery of species and that recovery impairment, by definition, does not constitute "harm" to a species. However, Defendants have misconstrued Plaintiffs' claim by focusing on Paragraph 9 of the March 15, 1991, Hadden Affidavit which refers to a study indicating that "habitat effectiveness must remain at 70% or greater to provide adequate habitat for recovery of the species."

Hadden Aff. at 3. Despite Mr. Hadden's reference to species recovery, it is readily apparent that Plaintiffs' claim is that existing road densities "actually injure grizzly bears" and not simply impair the ultimate recovery of the species. Therefore, Federal Defendants' argument concerning recovery impairment is unpersuasive.

■ All Defendants contend that Plaintiffs have failed to submit sufficient proof to support the taking claim. To survive a motion for summary judgment "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The Court further stated that "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. at 2510–11.

■ Plaintiffs argue forcefully that Defendants' failure to offer evidence controverting Plaintiffs' pleadings and affidavits demands a ruling that Plaintiffs have adequately established their claim. However, Rule 56 does not require that the "moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (Emphasis in original). In fact, where the nonmoving party bears the burden of proof at trial, as in this case, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Here, Defendants have not attempted to counter Plaintiffs' evidence but have instead attacked the adequacy of Plaintiffs' affidavits in support of their claim.

For the § 9 claim to survive, Plaintiffs must provide enough evidence to support a finding by a reasonable trier of fact that (1) the Flathead National Forest currently contains areas in which the open road density is in excess of one mile of road per square mile of forest land; (2) these road densities consti-

tute a "significant habitat modification;" (3) the habitat modification "significantly impair[s] essential behavioral patterns, including breeding, feeding or sheltering;" and (4) these impairments actually kill or injure grizzly bears and gray wolves.

The uncontroverted affidavits sufficiently support a finding that road densities in excess of one mile per square mile exist within the Forest, including in areas designated as crucial grizzly bear habitat. Hadden Aff. (March 15, 1991) at 3–4; Hammer Aff. (April 29, 1991) at 3–4. The April 29, 1991, affidavit of David Hadden offers ample scientific evidence based upon studies that excessive road densities can constitute a significant habitat modification. Based upon these studies, his expertise as a wildlife biologist, and his own knowledge of the Flathead National Forest, Hadden has offered sufficient support for the claim that the excessive road densities in the Forest are currently impairing essential behavioral patterns of the grizzly bear.

The pivotal element of Plaintiffs' claim is a showing of injury to the listed species. In this case, Plaintiffs are alleging that the grizzly bear and gray wolf species are adversely affected by current excessive road densities to the extent that their essential behavioral patterns are significantly impaired. When promulgating the current definition of "harm" the Secretary of the Interior stated that "[d]eath or injury, . . ., may be caused by impairment of essential behavioral patterns which can have significant and permanent effects on a listed species." 46 Fed. Reg. 54,748 (Nov. 4, 1981). However, the court does not read this to mean that scientific evidence supporting the conclusion that current excessive open road densities are impairing essential behavioral patterns is a sufficient basis on which to infer that death or injury is necessarily occurring. Whether the degree of impairment is so significant that it is actually killing or injuring grizzly bears is still an open question.

Though Plaintiffs have offered evidence of individual grizzly bear fatalities allegedly occurring near roads, these deaths appear to have been the result of sudden, direct, and violent contact with humans. Therefore, the

probative value of such fatalities when attempting to establish negative long-term effects on essential behavioral patterns of a listed species is questionable. However, with the April 29, 1991, affidavit of Keith Hammer, Plaintiffs have offered important evidence concerning a grizzly bear population decline. Though Plaintiffs themselves acknowledge that an accurate means for determining total grizzly bear population is not available, they have submitted evidence which could reasonably support a finding that the grizzly bear population in the Flathead Forest is in decline. *See* Hammer Aff. (April 29, 1991) at 4–7. The court recognizes that the evidence is slim in this regard and that the asserted decline is slight. However, common sense demands recognition of the fact that behavioral impairments are unlikely to result in sudden and dramatic decreases in population.

Therefore, the court concludes that Plaintiffs have offered sufficient evidence in support of their grizzly bear takings claim to withstand summary judgment, and that genuine issues of fact have been raised concerning the extent of excessive road densities in the Flathead Forest, the impact of those densities, the size of the grizzly bear population, and whether the purported decline in that population is traceable to the open road densities to warrant hearing Plaintiff's evidence at trial. The court does not find, however, that Plaintiffs have offered sufficient support for their takings claim concerning the gray wolf to withstand summary judgment.

Based on the foregoing analysis,

IT IS HEREBY ORDERED that Federal Defendants' and Defendant–Intervenor's motions for summary judgment on Plaintiffs' first cause of action are GRANTED,

Plaintiffs' motion for summary judgment on the first claim is DENIED, and Plaintiffs' first cause of action is DISMISSED.

IT IS FURTHER ORDERED that Defendant–Intervenor's motion for summary judgment on Plaintiffs' second cause of action is GRANTED as to Plaintiffs' claim of a § 9 taking of the endangered gray wolf, and DENIED as to Plaintiffs' claim of a § 9 taking

of the threatened grizzly bear. Plaintiffs' second cause of action is hereby DISMISSED to the extent it alleges a § 9 taking of the endangered gray wolf.

Judgment shall enter accordingly.